IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
radubolocan1971@gmail.com THAT IS
STORED AT PREMISES CONTROLLED
BY Google, Inc.

Case No.   19-mj-117-01-AJ____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Kyle D. Zavorotny, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google, Inc. (hereinafter referred to as "Google"), an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since June 16, 2002.  I am currently assigned to the Bedford, New Hampshire Resident Agency of the Boston Division of the FBI.  I investigate espionage-related criminal violations, including espionage, economic espionage, violations of export-control regulations, and other

offenses, including violations of Title 18 criminal statutes, to include 18 U.S.C. § 1001.  I have

received FBI training concerning computer-facilitated crime and other criminal activity.

      3.     I am responsible for enforcing federal criminal statutes and am authorized to

execute arrest and search warrants under the authority of the United States.  During my tenure as

a Special Agent, I have participated in the execution of numerous federal and state search

warrants involving computer equipment, documents, and electronically stored information, and I

have written and assisted in the writing of search warrant affidavits.

      4.      The facts in this affidavit come from my personal observations, my training and

experience, documents obtained through various legal processes, and information obtained from

other agents and witnesses.  This affidavit is intended to show that there is sufficient probable

cause for the requested warrant, but does not set forth all of my knowledge about this matter.

Statements attributed to individuals are paraphrased unless otherwise noted.

      5.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of 18 U.S.C. § 1001 have been committed by

Stela Sacara, also known as Stela Thomas, and/or Rochester Chemical LLC, Newedge

Technology LLC (also known as New Edge Technology LLC or New Edge Research LLC),

Sergiu Companeet, and others so far unidentified.  There is also probable cause to search the

information described in Attachment A for evidence and/or instrumentalities of these crimes

further described in Attachment B.

## JURISDICTION

      6.     This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      Stela Cornelievna Sacara (sometimes spelled Secara), also known as Stela Thomas, was born on or about October 10, 1986 in Moldova and is a citizen of that country. Sacara currently resides in Pembroke, New Hampshire.  Sacara has attempted to gain United States citizenship; however, her attempts have been denied and she is currently the subject of deportation proceedings.

8.      The FBI and the United States Department of Commerce Office of Export Enforcement (OEE) are conducting a joint criminal investigation regarding the activities of Stela Sacara, also known as Stela Thomas, multiple business entities operated by Sacara, including Rochester Chemical LLC, Newedge Technology LLC (also known as New Edge Technology LLC or New Edge Research LLC), Cryotec LLC, and other companies and individuals associated with Sacara and these entities.  Sacara operates Rochester Chemical and other business entities from an office located at 530 Chestnut Street, Suite 1A, Manchester, New Hampshire.

9.      On September 14, 2018, OEE Special Agent Courtney Rauch and FBI Special Agent Kyle Zavorotny interviewed Sacara in her office.  At the initiation of the interview, SA Rauch displayed his credentials and identified himself as a federal agent.  SA Zavorotny was introduced as a co-worker of SA Rauch.  Sacara was advised that the agents were there to discuss the company's compliance with U.S. export laws and regulations.

3

10.     The office was primarily a single room containing two desks and a sofa and was full of boxes, both sealed and opened, and some broken-down boxes.  There was a storage area off the office containing boxes.

11.     Two individuals were present in the office, Sacara and an individual who would only identify himself as "Serge."  Further investigation later identified him as Sergiu Companeet, with whom Sacara resides.

12.     Companeet told the agents that he only worked at the company "for food," moving boxes for Sacara as she was then pregnant.  Sacara has since given birth to the child, and Companeet told agents in a later interview that he is the father of the child.

13.     After the introductions, Sacara agreed to speak with the agents about the nature of her business and specifically about exports by the business.

14.     Sacara stated that she does accounting for Rochester Chemical, which she claimed was based in Delaware.  She stated the company's manager was named Amy Johnson, and that she believed Johnson resided in Delaware.  She stated that she did not have contact information for Johnson on hand at the time, but agreed to locate the contact information and e-mail it to SA Rauch.  She stated that other than Johnson and herself, the company would sometimes hire subject-matter experts (SMEs) to handle questions for customers; however, she identified no other company employees.

15.     Sacara stated that Rochester Chemical acquires consumable laboratory equipment such as bottles, vials, glassware, etc. for use in laboratories from various manufacturers, repackages them and ships them to purchasers.  She stated that the only company to which Rochester Chemical exports goods is a German company called Riol-Chemie.  She stated that Rochester Chemical ships items to Riol-Chemie "a couple of times a month."

4

16.     Sacara initially stated that Rochester Chemical does not deal with hazardous items.  After SA Zavorotny noted that one of the boxes was visibly marked with hazard stickers, Sacara stated that those items were only being shipped domestically, and that she meant that Rochester Chemical did not export hazardous items.  She stated that those items and others in that part of the office were being shipped to New Edge Research in Wyoming.

17.     Sacara stated that Rochester Chemical utilizes Federal Express for shipping.

18.     SA Rauch asked Sacara about her knowledge of U.S. export-control laws, and her responses showed she was familiar with concepts such as embargoed countries, Export Control Classification Numbers (ECCNs), and the meaning of items being classified "EAR99."  SA Rauch provided Sacara with several U.S. Department of Commerce handouts on export controls.

19.     In the course of the investigation, agents obtained a national security letter for records of a Bank of America account belonging to Rochester Chemical LLC.  According to these records, on April 20, 2015, a business banking account was opened at Bank of America's branch located at 620 Elm Street, Manchester, New Hampshire in the name of Rochester Chemical LLC.  The documents to open the account were completed by Sacara utilizing the name Stela Thomas.  In these documents, Sacara stated that Rochester Chemical is a limited liability company organized in Delaware and is classified for tax purposes as a single member sole proprietor LLC.  Sacara stated that her title was "Managing Member."

20.     On November 5, 2018, the U.S. Department of Commerce issued an administrative subpoena to Federal Express for records of shipments made by Sacara, Rochester Chemical and/or another company operated by Sacara utilizing the address of 530 Chestnut Street, Unit 1A, Manchester, NH, called Cryotek, LLC.

21.     The response provided by Federal Express included international shipments made from a company called New Edge Research utilizing the same address.  The individual sending these shipments was, in the vast majority of shipments, "Emily Patterson," however, one shipment sent in 2017 utilized the name "Amy Johonson."  The time frame covered by the response was from August 2016 through November 2018, a total of 28 months.

22.     During that time frame, over 130 shipments were sent from New Edge Research in Manchester to Riol-Chemie in Germany, a rate in excess of Sacara's characterization of "a couple of times a month."

23.     During the same time frame, hundreds of shipments were received in that office sent by many suppliers of biological, chemical and biochemical items.  The vast majority of these shipments were addressed to Rochester Chemical, and, in the cases where an individual's name was provided for the recipient at Rochester Chemical, the name provided was almost always "Amy Johnson."  A small number of shipments were addressed to Sacara or her known alias, Thomas, at Rochester Chemical or New Edge Research.

24.     In the entire time frame covered by the subpoena response, only one shipment was made to a destination in Wyoming, and in that case the recipient was not New Edge Research.

25.     On January 14, 2019, Special Agents Rauch and Zavorotny again visited the Rochester Chemical office, and found only Companeet present.  Companeet told the agents that Sacara was not in the office, and had not been to the office since having their baby on November 30, 2018.  He stated that he came to the office to receive and send packages.  Companeet was asked about Amy Johnson, and specifically whether Johnson exists.  Companeet shrugged his

shoulders and told the agents to ask Sacara.  He stated he had no information about the work at

the business and he just does what Sacara tells him to do.

26.     The same day, Special Agents Rauch and Zavorotny traveled to Sacara's

residence.  Sacara permitted the agents into the residence.  At this time, Sacara was told that

Special Agent Zavorotny is an agent of the Federal Bureau of Investigation and was shown his

credentials; Sacara also acknowledged that she remembered both agents from their previous

interview.  She was asked about the contact information for Johnson she had previously stated

she would provide, and she replied that she only had an e-mail address.  Special Agent

Zavorotny asked Sacara whether Johnson truly exists, and showed Sacara a copy of the Bank of

America document in which she stated she (Sacara) was the sole member of the limited liability

company.  Sacara stated she wished to speak with an attorney and declined to speak with the

agents further.  Sacara was provided with Special Agent Zavorotny's business card.

27.     As the agents were departing Sacara's residence, both agents noted that a laptop

computer was open in plain view on the kitchen island and was displaying a document including

large bold letters reading "New Edge Research LLC."

28.     That evening at approximately 6:17 p.m., Special Agent Zavorotny received an e-

mail sent to his FBI e-mail account from accounting@rochesterchemical.com, in which Sacara

stated that she had requested information about the company from "her superiors" and would

provide the information when she received it.

29.     The following day, January 15, 2019, at approximately 2:48 p.m., Special Agent

Zavorotny received a second e-mail from accounting@rochesterchemical.com which forwarded

an e-mail from radubolocan1971@gmail.com.  The sender of the forwarded e-mail identified

himself/herself as Radu Bolocan, and stated that he/she was the "current owner and director of

the company" and a citizen of Romania.  He/she stated that "Amy Johnson" was "Lanjewar Dulichand" located in India, and that he/she decided to use the name "Amy Johnson" since the true name was too hard to pronounce.  He/she stated that Rochester Chemical exported its products to Germany, and that he/she has requested "our German partner" to sign an end user certificate.  Bolocan claimed that he/she does not speak English; however, the English in the e-mail was nearly perfect.

30.     A check of United States government records found no records that any individual named Lanjewar Dulichand has entered the United States within the past several years.

31.     On January 16, 2019 at approximately 12:05 p.m., Special Agent Zavorotny received a third e-mail from Sacara at accounting@rochesterchemical.com, forwarding another e-mail from radubolocan1971@gmail.com.  In this e-mail, Bolocan stated that he/she provided "export compliance documents" for shipments made since October 2018, but needed more time to provide information prior to that date.

32.     The January 16, 2019 e-mail had four attachments.  One of the attachments was a document titled "Export End Use Certification" which listed the "Purchaser" as Riol Chemie GMBH in Lilienthal, Germany, and the "End User/Ultimate Consignee" as Analiticheskie Tehnologii in Moscow, Russia.

33.     A second attachment contained a set of documents with letterheads reading "Analytical technologies Limited Liability Company" with an address in Moscow.  They are titled "Annex 1. Detailed list of commodities" and bear various dates.  The dates are not clear as some are clearly written in a European format (day/month/year, e.g. 16/10/2018, 30/10/2018), some are written in an American format (month/day/year, e.g. 12/18/2018, 11/19/2018), and others could be in either format.  However, all are dated in the year 2018, all appear to be lists of

shipment contents, and all are purportedly signed by "Yu. E. Butyrskaya," CEO of Analytical Technologies.  The attachment contains fifteen (15) such documents, and ends with a single page document titled "End Use Certification" signed by Butyrskaya and dated January 16, 2019.

34.     During the approximately 7-week period of overlap between the period covered by the Federal Express administrative subpoena response and the period covered by the lists of commodities described in paragraph 33 (October 1, 2018 through November 19, 2018), shipments were sent from New Edge Research in Manchester to Riol-Chemie in Germany on thirteen (13) dates.  The lists of commodities provided only include six documents with dates matching those Federal Express shipping dates; there is one list of commodities which does not bear a date.  None of the list of commodities provided for that time period is dated on a date on which no Federal Express shipments were made.

35.     A comparison of the invoices provided to Federal Express listing the items exported in each shipment to the lists of commodities provided by Bolocan revealed that they are not similar.  Additionally, the invoices provided to Federal Express contain items which do not appear on any of the lists of commodities; for example, several of the invoices include several quarts of "Silicon Bath Fluid" as included in the shipment, but none of the lists of commodities includes items by that name, nor any items in similar quantities; in fact, the word "silicon" does not appear on any of the lists (the word "silicone" does appear, but only in reference to silicone tubing).

36.     Records obtained from Bank of America show that Rochester Chemical received sizeable incoming wire deposits from foreign entities, including entities located in Estonia, Slovakia, the United Arab Emirates, and the United Kingdom.  The purposes listed for these wires include "chemical goods," "electronic equipment," and "laboratory equipment."  In 2017

and through November 2018, foreign entities other than Analytical Technologies wired

Rochester Chemical $975,377.62.  The last of these wires occurred in February 2018.

37.     During the same time period, Rochester Chemical received incoming wire

deposits from Analytical Technologies totaling $2,091,486.45.

38.     During the same time period, Rochester Chemical did not receive any incoming

wire deposits from Riol-Chemie.

39.     Many of the invoices provided by Federal Express list the "Exporter" as Emily

Patterson of New Edge Research, 530 Chestnut Street, Unit 1A, Manchester, NH, and list an e-

mail address of sales@new-edge-research.com.  The "Consignee" is Sergei Venger of Riol-

Chemie GmbH, Gobelstrasse 21, Lilienthal, Germany, and under "Sold To:" a box labeled

"Same as Consignee" is checked.  An e-mail address is also provided for Venger of

accounting@new-edge-research.com.

40.     Investigation determined that Rochester Chemical made two shipments of large

laboratory equipment to Riol-Chemie utilizing freight forwarding company Highland

Forwarding, Inc. based in Londonderry, New Hampshire.  One shipment was made in October

2017 and the second shipment occurred in January 2018.

41.     In sum, probable cause exists that Stela Sacara, also known as Stela Thomas,

and/or Rochester Chemical LLC, Newedge Technology LLC (also known as New Edge

Technology LLC or New Edge Research LLC), Sergiu Companeet, and others so far

unidentified, violated 18 U.S.C. § 1001 by making the following false statements to individuals

known to them as federal agents in a matter within the jurisdiction of the executive branch of the

Government of the United States:

a.  Sacara stated that she performs accounting for Rochester Chemical; however, on Bank of America documents, Sacara identified herself as the sole and managing member of the company;

b.  Sacara stated that the company's manager is named "Amy Johnson," and that Johnson resides in Delaware, and despite allegedly being "managed" by Johnson, Sacara claimed to have only an e-mail address for Johnson.  As stated above, the Bank of America documents show that Sacara is the sole and managing member of the limited liability company.  Sacara's own boyfriend, who resides with her and works in the office with her, stated that he takes direction from Sacara and only shrugged his shoulders when asked about Johnson.  According to a statement by Radu Bolocan, "Amy Johnson" is in fact "Lanjewar Dulichand" located in India, and despite Sacara's claim that Johnson resides in Delaware, and that the vast majority of the items shipped to the company are addressed to "Amy Johnson," there is no record of anyone named Lanjewar Dulichand entering the United States in the past several years;

c.  Sacara stated that Rochester Chemical does not deal with hazardous items, despite boxes visibly marked with hazard stickers in the office;

d.  When the boxes bearing hazard stickers were brought to her attention, Sacara stated that she meant the company did not export hazardous materials, and that hazardous items were only sent domestically, to New Edge Research located in Wyoming; Federal Express records show only one shipment made to Wyoming in the 28-month period covered by the records, and that shipment was not to New Edge Research.  In fact, some shipments delivered to the Rochester Chemical

11

office address were addressed to New Edge Research in Sacara's name or that of her known alias; shipments made to Riol-Chemie in Germany provided an e-mail address for the recipient utilizing a New Edge Research domain; and Sacara's laptop was observed displaying a document prominently displaying the name "New Edge Research LLC";

e. By e-mail, "Radu Bolocan" stated that he or she is the owner and director of Rochester Chemical, although Sacara identified herself as the sole and managing member of the limited liability company in bank documents and initially Sacara only provided the name "Amy Johnson" as the only other person associated with the company;

f. In the January 15, 2019 e-mail, Bolocan stated the company exports products to Germany and that he/she asked the "German partner" to provide an end-user certificate, but in the attachments to the e-mail sent the next day, the end-user certificate provided shows that the end-user is in Russia;

g. When asked by SA Rauch about exports, Sacara stated the only company to which Rochester Chemical exported goods was Riol-Chemie in Germany; however, the bank records show over $3 million of incoming wire deposits from foreign entities to Rochester Chemical, none of which came from Riol-Chemie;

h. The lists of items shipped provided with the January 16, 2019, e-mail do not match the descriptions of items in the Federal Express records.

42.    An Internet search found that the domains rochesterchemical.com and new-edge-research.com are hosted by GoDaddy.  The e-mails from Radu Bolocan were from a Gmail address, which is a service provided by Google.  Sacara is known to utilize a personal e-mail

account of stelase_cara@yahoo.com; Yahoo! e-mail addresses are currently provided by Oath
Holdings, Inc.

43.     Based on my training and experience, I know that individuals involved in
conspiracies to commit crimes frequently discuss their plans via e-mail.  I know that this is
especially true in cases where one or more of the conspirators are located in different countries.
In this case, while Sacara is located in the United States, Bolocan is possibly located in Romania,
and Dulichand (if she exists) is possibly located in India.  It is likely that Sacara also utilized her
personal e-mail account to plan and coordinate her actions and statements with others.

44.      A preservation letter requesting the preservation of all records regarding the e-
mail address radubolocan1971@gmail.com and any and all associated accounts pursuant to Title
18, U.S.C. § 2703(f) for a 90-day period was delivered to Google on January 17, 2019, and an
extension letter requesting preservation of the same records for an additional 90-day period was
delivered to Google on April 12, 2019.

45.     In general, an email that is sent to a Google subscriber is stored in the subscriber's
"mail box" on Google servers until the subscriber deletes the email.  If the subscriber does not
delete the message, the message can remain on Google servers indefinitely. Even if the
subscriber deletes the email, it may continue to be available on Google's servers for a certain
period of time.

### BACKGROUND CONCERNING EMAIL

46.     In my training and experience, I have learned that Google provides a variety of
on-line services, including electronic mail ("email") access, to the public.  Subscribers obtain an
account by registering with Google.  During the registration process, Google asks subscribers to
provide basic personal information.  Therefore, the computers of Google are likely to contain

stored electronic communications (including retrieved and unretrieved email for Google

subscribers) and information concerning subscribers and their use of Google services, such as

account access information, email transaction information, and account application information.

In my training and experience, such information may constitute evidence of the crimes under

investigation because the information can be used to identify the account's user or users.

      47.     An Google subscriber can also store with the provider files in addition to emails,

such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

emails), and other files, on servers maintained and/or owned by Google.  In my training and

experience, evidence of who was using an email account may be found in address books, contact

or buddy lists, email in the account, and attachments to emails, including pictures and files.

      48.     In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account.  Such

information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number).  In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users.  Based on my training and my experience, I

know that, even if subscribers insert false information to conceal their identity, this information

often provides clues to their identity, location, or illicit activities.

      49.     In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems.  This

information can include the date on which the account was created, the length of service, records

of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

50.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

51.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such

15

as date and time) may indicate who used or controlled the account at a relevant time.  Further,

information maintained by the email provider can show how and when the account was accessed

or used.  For example, as described below, email providers typically log the Internet Protocol

(IP) addresses from which users access the email account, along with the time and date of that

access.  By determining the physical location associated with the logged IP addresses,

investigators can understand the chronological and geographic context of the email account

access and use relating to the crime under investigation. This geographic and timeline

information may tend to either inculpate or exculpate the account owner.  Additionally,

information stored at the user's account may further indicate the geographic location of the

account user at a particular time (*e.g.*, location information integrated into an image or video sent

via email).  Last, stored electronic data may provide relevant insight into the email account

owner's state of mind as it relates to the offense under investigation. For example, information in

the email account may indicate the owner's motive and intent to commit a crime (*e.g.*,

communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications

in an effort to conceal them from law enforcement).

52.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully Submitted,

/s/ Kyle D. Zavorotny
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to before me on May 16, 2019.

Honorable Andrea K. Johnstone
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with e-mail address

radubolocan1971@gmail.com and any and all associated  accounts that are stored at premises

owned, maintained, controlled, or operated by Google, Inc, an email provider headquartered at

1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) January 15, 2019 and extended on April 12, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the e-mail address radubolocan1971@gmail.com, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the e-mail and associated accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account(s) was/were created, the length of service, the IP address used to register the accounts, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

2

       d.     All records or other information stored by an individual using the e-mail and associated accounts, including address books, contact and buddy lists, calendar data, pictures, and files; and

       e.     All records pertaining to communications between the Provider and any person regarding the e-mail address and/or associated accounts, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18

U.S.C. § 1001, those violations involving Stela Secara, also known as Stela Thomas, and/or

Rochester Chemical LLC, Newedge Technology LLC (also known as New Edge Technology

LLC or New Edge Research LLC), Sergiu Companeet, and others so far unidentified and

occurring after on or after September 14, 2018, including, for each account or identifier listed on

Attachment A, information pertaining to the following matters:

(a)  Evidence of false statements made to United States federal agents during
interviews on September 14, 2018 and January 14, 2019 and by e-mails over the
days following January 14, 2019, and conspiracy among individuals utilizing
these domains/accounts to make such false statements;

(b)  Evidence relating to exports by Rochester Chemical and Newedge Technology,
including evidence relating to contents of exports, end users, and payors of funds
wired to Rochester Chemical;

(c)  Evidence related to hazardous items received, shipped, or exported by Rochester
Chemical and Newedge Technology;

(d)  Evidence related to managers or employees of Rochester Chemical and Newedge
Technology, including evidence related to the roles and existence or non-
existence of Amy Johnson, Lanjewar Dulichand, Emily Patterson, and Radu
Bolocan;

(e)  Evidence indicating how and when the email account was accessed or used, to
determine the geographic and chronological context of account access, use, and
events relating to the crime under investigation and to the email account owner;

4

(f)  Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(g)  The identity of the person(s) who created or used the domains/accounts, including records that help reveal the whereabouts of such person(s).

(h)  The identity of the person(s) who communicated with the user(s) of the domains/accounts about matters relating to violations of 18 U.S.C. § 1001, including records that help reveal their whereabouts.

## **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google, Inc., and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google, Inc.. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, Inc., and they were made by Google, Inc. as a regular practice; and

b.      such records were generated by Google, Inc. electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google, Inc. in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Google, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

6

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                     Signature